

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THAYLIA DONNA QUINN, individually,<br><br>                                        Plaintiff,<br><br>v.<br><br>PROCTOR & GAMBLE CO.; WAL-MART STORES, INC.; TARGET CORPORATION; and DOES 1–100, inclusive,<br><br>                                        Defendants. | Case No.:  24-CV-856 JLS (SBC)<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>(ECF No. 14) |

Presently before the Court are Defendants Procter & Gamble Co. ("P&G"), Walmart Inc., and Target Corporation's (collectively, "Defendants") Motion to Dismiss ("Mot.," ECF No. 14) and supporting Memorandum of Points and Authorities ("Mem.," ECF No. 14-1).  Plaintiff Thaylia Donna Quinn filed an Opposition to the Motion ("Opp'n," ECF No. 16), to which Defendants filed a Reply in Support of the Motion ("Reply," ECF No. 18).  Also before the Court is a Notice of Supplemental Authority ("Not.," ECF No. 19), filed by Defendants.

Having carefully reviewed Plaintiff's Complaint ("Compl.," ECF No. 1-3), the Parties' arguments, and the law, the Court **GRANTS** Defendants' Motion.

/ / /

## BACKGROUND

Plaintiff is a resident of Murrieta, California who "habitually purchased Herbal Essence-branded [dry shampoo and conditioner] from Walmart and Target in San Diego County throughout the past decade." Compl. ¶ 20. Most Americans are likely familiar with Herbal Essences—the cosmetic brand has been in stores since 1971 and was acquired by P&G, "a global leader in the manufacturing, distributing, and sale of personal care products," in 2001. *Id.* ¶¶ 34, 38. After acquiring Herbal Essences, "P&G expanded the Herbal Essences Brand into aerosol spray shampoos and conditioners," the health care products ("Products") at the center of this dispute. *Id.*

In reliance on P&G's "size and sterling reputation, [which] instantly lends credibility to [its] product line," Plaintiff "used P&G's personal care products for decades." *Id.* ¶¶ 6, 35. Unbeknownst to Plaintiff, however, was the alleged presence of "significant and unsafe levels of benzene—a known human carcinogen"—in certain Products manufactured by P&G. *Id.* ¶ 4. Particularly susceptible to benzene, says Plaintiff, are the underarms and scalp, of which the "outermost layer of the skin is thinner and less protective." *Id.* ¶ 3. This outermost layer, or the stratum corneum, is critical to wellbeing as it "provides a barrier that protects against unwanted chemicals passing through the skin, into the bloodstream or lymphatic system and, ultimately, the internal organs." *Id.* ¶ 2. One such unwanted chemical is benzene. *Id.* ¶ 1. Plaintiff blames the benzene allegedly found in certain of the Products for the Chronic Lymphocytic Leukemia ("CLL") and bone marrow cancer of which she now suffers. *Id.* ¶ 6.

Generally speaking, several voices from the scientific community support the contention that exposure to benzene—"a colorless or light-yellow liquid at room temperature"—is "detrimental to human health." *Id.* ¶¶ 25–26. Plaintiff cites a plethora of governmental agencies and other entities that have reached this conclusion. For example, the "World Health Organization and the International Agency for Research on Cancer ("IARC") have classified benzene as a Group 1 compound that is carcinogenic to humans." *Id.* ¶ 28. The United States Food and Drug Administration ("FDA") has

similarly labeled benzene a "Class 1 solvent," which means that it "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity." *Id.* ¶ 29. The National Institute for Occupational Safety and Health, the American Petroleum Institute, and multiple academic studies also favor a risk-adverse approach, with one 2010 study commenting that "[t]here is probably no safe level of exposure to benzene, and all exposures constitute some risk." *Id.* ¶¶ 30–31. That said, the jury is out as far as what level of benzene exposure is tolerable as the FDA does permit the use of Class 1 solvents "if their use is unavoidable in order to produce a drug product with a significant therapeutic advance," in which case the solvents should be restricted to two parts per million ("ppm"). *Id.*

The State of California has taken precautionary measures with respect to benzene and other like chemicals beyond those taken at the federal level, two of which Plaintiff highlights in her Complaint. *First*, Plaintiff cites the California Safe Cosmetics Act of 2005 ("CSCA"). *See* Compl. ¶¶ 43–54. Under the CSCA, manufacturers of cosmetic products containing "a chemical identified as causing cancer or reproductive toxicity" must make certain public disclosures. CAL. HEALTH & SAFETY CODE § 111792(a). Because it has been "given an overall carcinogenicity evaluation of Group 1, Group 2A, or Group 2B by the [IARC]," benzene fits the mold. *Id.* § 111791.5(b)(2). Plaintiff alleges that P&G has violated the CSCA because it "has *never* reported the significant and unsafe levels of benzene in any of [its] cosmetic products . . . ." Compl. ¶ 51. *Second*, Plaintiff cites Proposition 65 ("Prop 65"), which prohibits businesses from knowingly exposing consumers to chemicals known to the state to cause cancer or reproductive toxicity without adequate warnings. *See* Compl. ¶¶ 55–58 (citing CAL. HEALTH & SAFETY CODE § 25249.5, *et seq.*). As she does above with respect to the CSCA, Plaintiff alleges that P&G has violated Prop 65 by declining to provide the required warnings despite exposing the public to benzene from the Products. *Id.* ¶ 57.

To support her claim that P&G's Products contain some amount of benzene, Plaintiff relies on two data points. *First*, Plaintiff alleges that "[s]everal of the [Products] were

independently tested and shown to contain dangerous levels of benzene, a known human carcinogen." *Id.* ¶ 7. Though Plaintiff does not crisply define this independent testing, she later references the so-called Valisure Tests, which revealed that the Products "contain some of the highest concentrations of benzene in the cosmetics industry." *Id.* ¶ 52. *Second*, Plaintiff pinpoints a P&G "recall of certain dry conditioner and shampoo products 'from Herbal Essences due to the presence of benzene.'" *Id.* ¶ 41. According to Plaintiff, this recall, which took place on December 17, 2021, provides evidence that "P&G was well aware that they were exposing individuals to benzene at levels requiring a warning under [Prop 65]." *Id.* ¶ 58. Plaintiff alleges that these indicators, coupled together with "the longstanding recommendations of the scientific community extolling the dangerousness of benzene exposure," demonstrate that "Defendants were aware well in advance of placing the [Products] into the stream of commerce that they were prone to unreasonably high rates of benzene presence," but they "knowingly failed to take any action to correct the defects in the [Products], including failing to warn or otherwise educate the public," "in order to advance their pecuniary gains." *Id.* ¶¶ 62–65.

Plaintiff brought this action on November 9, 2023, in the Superior Court of the State of California. *See* Compl. After service of the Complaint on April 18, 2024, Defendants timely removed the case to this Court on May 15, 2024. *See* ECF No. 1 at 4. Plaintiff asserts six causes of action, all under California state law: (1) negligence, (2) failure to warn, (3) design defect, (4) manufacturing defect, (5) breach of implied warranty of merchantability, and (6) fraudulent concealment. *See* Compl. Defendants filed the instant Motion on June 17, 2024, seeking dismissal of all claims. *See* Mot. Embedded throughout the Motion in a scattershot fashion are various requests by Defendants to take judicial notice of certain documents and/or websites. The Court begins by addressing these requests.

## REQUEST FOR JUDICIAL NOTICE

Defendants request the Court take judicial notice and/or incorporate by reference the following documents: (1) P&G's December 17, 2021, recall notice as published on the

FDA website ("Recall Notice"); (2) FDA's December 5, 2022, letter to Valisure questioning the validity of its testing methodology ("Valisure Letter"); (3) the American Cancer Society's website noting the wide use of benzene ("ACS Website"); (4) FDA's December 27, 2023, alert regarding the risks of benzene contamination ("FDA Alert"); and (5) California Office of Environmental Health Hazard Assessment's website regarding safe harbor exposure levels for benzene ("Safe Harbor List") (collectively, "Noticed Documents"). *See* Mem. at 8 n.1, 9 n.2, 9 n.3, 10 n.4, 21 n.5.[1]

## I.    Legal Standard

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)). "There are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201." *Id.* Both exceptions "permit district courts to consider materials outside a complaint . . . ." *Id.*

Under the incorporation-by-reference doctrine, a court may "take into account documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'" *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (alteration in original) (quoting *In re Silicon Graphics Inc. Secs. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)). A defendant may seek to incorporate a document into the complaint in two ways. First, "if the plaintiff refers extensively to the document," it may be incorporated by reference. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Second, a document may be incorporated by reference if "the document forms the basis of the plaintiff's claim." *Id.* at 908. A document forms

/ / /

---

[1] All citations refer to the blue page numbers affixed to the top right corner of each page in the Court's CM/ECF system.

the basis of the plaintiff's claim when "the claim necessarily depend[s]" on the document. *Khoja*, 899 F.3d at 1002 (quoting *Knievel*, 393 F.3d at 1076).

"The defendant may offer such a document, and the district court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Ritchie*, 342 F.3d at 908. However, "[t]he incorporation-by-reference doctrine does not override the fundamental rule that courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage." *Khoja*, 899 F.3d at 1014.

"[T]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "Accordingly, '[a] court may take judicial notice of matters of public record . . . .'" *Khoja*, 899 F.3d at 999 (quoting *Lee*, 250 F.3d at 689). This would include information "made publicly available by government entities . . . and neither party disputes the authenticity of the web sites or the accuracy of the information displayed therein." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010). However, "a court cannot take judicial notice of disputed facts contained in such public records." *Khoja*, 899 F.3d at 999 (citing *Lee*, 250 F.3d at 689).

## II.    Analysis

Defendants' primary argument with respect to most of the documents subject to the Request for Judicial Notice stems from the fact that the documents are publicly available, mostly from government websites. Defendants go one step further with respect to the Recall Notice and ACS Website, asking the Court to consider the documents to be incorporated by reference, but Defendants provide no substance to this argument, nor do they cite any cases expounding upon the incorporation-by-reference doctrine. *See* Mem. at 8 n.1, 9 n.3.

Plaintiff objects to all five documents except for one, the Recall Notice. *See* Opp'n at 9–11. As far as the other documents are concerned, Plaintiff argues that Defendants are

using the Request for Judicial Notice "as a vehicle to raise factual disputes on the danger of benzene." *Id.* at 10.  She contends that the safety profile of benzene is a factual matter "that should be addressed at a later stage with the protections of Rule 56 and the benefit of completed discovery." *Id.* at 11.

Defendants respond that Plaintiff is mischaracterizing the nature of their request. The Request for Judicial Notice, Defendants submit, does not raise a factual dispute as to benzene's safety but merely lays the "context for the *legal* requirement that Plaintiff must plead more than conclusory allegations that *any* amount of benzene is inherently unsafe and that *all* Herbal Essences products contained benzene."  Reply at 2–3 (emphasis in original).  In other words, it is not the truth of the information contained within the documents that Defendants request the Court to take notice of but the existence of the documents themselves. *Id.* at 2.

Defendants are correct.  Taken collectively, the Noticed Documents are probative of the fact that certain governmental and nonprofit entities have opined on the safety of benzene exposure, expressing a range of viewpoints as to the pervasiveness of benzene in commercial products and as to how much benzene exposure is permissible.  Plaintiff does not question the authenticity of these documents, and their mere existence is undisputed. Thus, to the extent Defendants ask the Court to take judicial notice of the existence of these websites, the request is granted.  *See Herrington v. Johnson & Johnson Consumer Cos., Inc.*, No. C 09-1597 CW, 2010 WL 3448531, at *1 n.1 (N.D. Cal. Sept. 1, 2010) ("The Court takes judicial notice of these documents to the extent that it is not subject to reasonable dispute that the statements made in these documents were made by the entities responsible for their publication." (citing Fed. R. Evid. 201)).  Defendants make clear that they are not asking the Court to take judicial notice of the demonstrated safety of benzene exposure, and, indeed, the Court agrees that it should not take judicial notice "of the truth of the facts asserted in [the Noticed Documents]." *Gagetta v. Walmart, Inc.*, 646 F. Supp. 3d 1164, 1172 (N.D. Cal. 2022).  With that caveat, the Court **GRANTS** Defendants' Request for Judicial Notice.

With respect to the Recall Notice and ACS Website, the Court declines to consider those documents incorporated by reference.  Unlike the doctrine of judicial notice, documents that are incorporated by reference into a complaint are assumed to be "true for purposes of a motion to dismiss under Rule 12(b)(6)."  *Ritchie*, 342 F.3d at 908.  Neither the Recall Notice nor the ACS Website was referred to extensively in the Complaint nor did they form the basis of the claim.  *See id.* (describing how incorporation by reference might be appropriate "when a plaintiff's claim about insurance coverage is based on the contents of a coverage plan, or when a plaintiff's claim about stock fraud is based on the contents of SEC filings" (first citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir. 1998); and then citing *Silicon Graphics*, 183 F.3d at 986)).  Thus, these two documents are not incorporated by reference into the Complaint.  In any event, Defendants fail to advance concrete arguments to the contrary, so the Court considers this undeveloped argument waived.  *See Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994) (considering argument waived due to the "failure to present a specific, cogent argument for [the court's] consideration").

## MOTION TO DISMISS

### I.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted."  To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  Facts "'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief.  *Id*. (quoting *Twombly*, 550 U.S. at 557).

/ / /

1    Though this plausibility standard "does not require 'detailed factual
2    allegations,' . . . it [does] demand[] more than an unadorned, the-defendant-unlawfully-
3    harmed-me accusation." *Id*. (quoting *Twombly*, 550 U.S. at 555). In other words, a
4    complaint will not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual
5    enhancement.'" *Id*. (alteration in original) (quoting *Twombly*, 550 U.S. at 557). Put
6    differently, "a formulaic recitation of the elements of a cause of action will not do." 
7    *Twombly*, 550 U.S. at 555.

8    Review under Rule 12(b)(6) requires a context-specific analysis involving the
9    Court's "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. In performing
10   that analysis, "a district court must accept as true all facts alleged in the complaint, and
11   draw all reasonable inferences in favor of the plaintiff." *Wi-LAN Inc. v. LG Elecs., Inc.*,
12   382 F. Supp. 3d 1012, 1020 (S.D. Cal. 2019). "[W]here the well-pleaded facts do not
13   permit the court to infer more than the mere possibility of misconduct, the complaint has
14   alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S.
15   at 679 (second alternation in original). If a complaint does not survive Rule 12(b)(6), a
16   court grants leave to amend unless it determines that no modified contention "consistent
17   with the challenged pleading could . . . possibly cure the deficiency." *Schreiber Distrib.*
18   *Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

19   **II.    Analysis**

20   Defendants begin their Motion by raising a global challenge to all six of Plaintiff's
21   claims on causation grounds. Each cause of action in this suit, they say, "require[s] a
22   plausible allegation that benzene exposure from her Herbal Essences products caused
23   Plaintiff's CLL." Mem. at 12. But according to Defendants, the Complaint fails this
24   causation requirement on two fronts, both with respect to whether the specific personal
25   care products that Plaintiff used contained benzene and whether those same personal care
26   products contained enough benzene to have caused Plaintiff's disease. *See id*. Defendants
27   then argue that this pleading failure resulted in additional deficiencies in Plaintiff's product
28   liability claims. They also argue that Plaintiff's fraudulent concealment claim lacks the

9

1    requisite particularity required by Federal Rule of Civil Procedure 9(b) and that Plaintiff

2    does not sufficiently allege that Defendants Target or Walmart could be liable for any

3    claims besides the strict liability claims.  *See id.* at 23–24.

4        **A.  Causation**

5        Defendants' global arguments surrounding causation apply equally to all six of

6    Plaintiff's claims.  This is because all six causes of action require a showing of causation

7    in order to be viable.  *See U.S. Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 463 P.2d 770, 774

8    (Cal. 1970) (stating the principle that negligence requires the alleged breach to be the "the

9    proximate or legal cause of the resulting injury"); *Greenman v. Yuba Power Prods., Inc.*,

10   377 P.2d 897, 900 (Cal. 1963) (en banc) ("A manufacturer is strictly liable in tort when an

11   article he places on the market . . . proves to have a defect that causes injury to a human

12   being."); *Gutierrez v. Carmax Auto Superstores Cal.*, 248 Cal. Rptr. 3d 61, 74 (Ct. App.

13   2018) (noting that a cause of action for implied warranty of merchantability requires

14   sufficient allegations of causation); *Graham v. Bank of Am., N.A.*, 172 Cal. Rptr. 3d 218,

15   228 (Ct. App. 2014) (requiring the plaintiff to "sustain[] damage as a result of the

16   [fraudulent] concealment").  Accordingly, the Court begins by addressing these universally

17   applicable arguments.

18       *1.  Sufficiency of Allegations Related to Benzene Level in Products*

19       One ground upon which Defendants challenge Plaintiff's allegations is that Plaintiff

20   failed to plausibly allege that she was exposed to high enough benzene levels to cause her

21   disease.  Although Plaintiff alleged that several of the Products "contain dangerous levels

22   of benzene," Defendants argue that this allegation is far too conclusory because Plaintiff

23   "does not specify *how much* benzene Plaintiff believes was present in those products."

24   Mem. at 15–16 (quoting Compl. ¶ 7).  Allegations regarding the specific amount of

25   benzene present in the Products and allegations regarding the specific benzene level needed

26   to elevate cancer risk are required to state a plausible claim, Defendants say.  *Id.* at 16.

27       Plaintiff counters by highlighting the numerous studies and reports cited in her

28   Complaint from entities—including the Department of Health and Human Services

("DHHS"), WHO, IARC, FDA, and more—"all of whom opine that *any level of benzene exposure is dangerous*." Opp'n at 15 (citing Compl. ¶¶ 27–33). According to Plaintiff, these studies not only suggest that benzene is dangerous, but they also reveal a causal connection between benzene exposure and CLL. *Id.*

On this point, the Court concludes that Plaintiff has satisfied her pleading requirement by relying upon sufficient academic literature suggesting a plausible connection between benzene exposure and CLL. For example, Plaintiff cites a study from the American Petroleum Institute from 1948 stating that "it is generally considered that the only absolutely safe concentration for benzene is *zero*." Compl. ¶ 31. She also cites a 1939 study from the Journal of Industrial Hygiene and Toxicology stating that "exposure over a long period of time to any concentration of benzene greater than zero is not safe." *Id.* More recently, a 2010 study in the Annual Review of Public Health stated that "[t]here is probably no safe level of exposure to benzene, and all exposures constitute some risk[.]" *Id.* Plaintiff goes on to cite data from the IARC linking benzene exposure to CLL, the specific form of cancer she developed. *Id.* ¶ 28.

These factual allegations by no means prove that exposure to benzene does indeed cause CLL, but they at minimum show that such a claim is plausible. Defendants resist this conclusion by citing to countervailing evidence suggesting that only exposure to "high levels of benzene," *i.e.*, industrial levels, can cause an increased risk of cancer. Mem. at 16 (citing ACS Website). They emphasize the fact that "benzene is ubiquitous in the environment," a fact recognized by Plaintiff in the Complaint. *Id.* (citing Compl. ¶ 25). But Plaintiff sufficiently alleges that exposure to even low levels of benzene can increase health risks, distinguishing this case from *Brief v. Idelle Labs, Ltd.*, which Defendants rely upon for the proposition that Plaintiff must allege exposure to a "high level" of benzene to make her claim plausible. *See* Opp'n at 17 (citing *Brief v. Idelle Labs, Ltd.*, No. 2:22-cv-05085 (WJM), 2023 WL 2860345, at *3 (D.N.J. Apr. 10, 2023)). There, unlike here, the complaint contained no allegations that exposure to low levels of benzene could result in cancer. *See Brief*, 2023 WL 2860345, at *1. Thus, the allegations in *Brief*

suffered from a disconnect between the plaintiff's exposure levels and the cited academic literature. *See id.* at *3.

No such disconnect exists here. Plaintiff alleges sufficient facts supporting the proposition that exposure to low levels of benzene can cause CLL. Plaintiff's allegation that she was "regularly" exposed to benzene from the Products is enough to make her claims plausible with respect to whether or not slight benzene exposure could cause CLL. *See* Compl. ¶ 13. Defendants' only other cited case is inapposite as the cause of action in that case was subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b) associated with fraud claims.[2] *See Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1090 (N.D. Cal. 2017). In general, "[w]hat constitutes an 'unsafe level' . . . is a question of fact not appropriately resolved on a motion to dismiss." *Rodriguez v. Mondelez Global LLC*, 703 F. Supp. 3d 1191, 1205 (S.D. Cal. 2023) (citing *Bland v. Sequel Nat. Ltd.*, No. 18-cv-04767-RS, 2019 WL 4674337, at *4 (N.D. Cal. Aug. 2, 2019)). The Court declines to resolve that question of fact here.

### 2.    Sufficiency of Allegations Related to Plaintiff's Benzene Exposure

Defendants' second causation-based argument is a closer call. In addition to arguing that Plaintiff insufficiently alleged a causal nexus between benzene exposure and cancer, they also argue that Plaintiff insufficiently alleged that she was exposed to benzene in the first place. This argument is based on Plaintiff's "general allegations" that she used Herbal Essences personal care products, which omit any reference to the specific products that Plaintiff used. *See* Mem. at 13. Because under California law, a plaintiff must "identify each product that allegedly caused [her] injury," Defendants claim that Plaintiff's "general allegations" fail to state a plausible claim. *See id.* (quoting *Bockrath v. Aldrich Chem. Co., Inc.*, 980 P.2d 398, 404 (Cal. 1999)).

---

[2] In *Hadley*, the Court's analysis with respect to what constituted an unhealthy level of sugar in cereal and cereal bars was only relevant to the question of whether the defendant's statements were false or misleading. *See* 243 F. Supp. 3d at 1090. That question has minimal bearing on the issue before the Court.

In response, Plaintiff argues that Defendants have mischaracterized the applicable pleading standard as demanding a heightened level of particularity more akin to Federal Rule of Civil Procedure 9(b) rather than the one required by Federal Rule of Civil Procedure 8(a), the latter of which is applicable to the instant Motion. Opp'n at 11–14. When analyzed in light of the proper standard, Plaintiff claims that she has stated a plausible claim by alleging her habitual purchase and use of "Herbal Essences dry shampoo and conditioner." *Id.* at 14 (citing Compl. ¶¶ 6, 7, 20, 38). Plaintiff argues that her proffered evidence of benzene presence in the Products—third-party testing, *i.e.*, the Valisure Tests, and the P&G recall—adds credence to her theory that the personal care products she used contained benzene. *See id.* at 14–15.

The Court begins by noting that the law regarding the appropriate level of generality with which to analyze the plausibility of defective product claims appears unsettled within the Ninth Circuit. Both sides cite to myriad cases from within the Circuit and without, some of which conclude that similar allegations as here successfully state a claim while others come out the other way. To thoroughly convey the disparate nature of these decisions, the Court sets out to summarize the case law at present, beginning with Defendants' cases.

Naturally, Defendants cite to instances where courts have rejected the plaintiff's defective product claims. Most closely analogous to the instant action are two cases out of Louisiana, both of which, as here, involve allegations that P&G's products caused the plaintiffs' cancer. In *Rooney v. Procter & Gamble Co.*, the court dismissed the plaintiffs' claims under the Louisiana Products Liability Act ("LPLA") where the plaintiffs alleged that they developed breast cancer as a result of using Secret antiperspirant, one of P&G's antiperspirant products. No. 22-1164, 2023 WL 1419870, at *1 (E.D. La. Jan. 31, 2023). There, as here, the plaintiffs relied upon the Valisure Tests to show that the antiperspirant products they used contained benzene. *See id.* The plaintiffs alleged that they retained possession of a partially used six-ounce can of Secret Aerosol Powder Fresh, a product the

/ / /

13

Valisure Tests concluded contained benzene in certain batches identified by lot number. *See id.* at *4.

Despite allegations matching the product the plaintiffs used to one that had been shown to contain benzene in the Valisure Tests, the court dismissed the claims. *Id.* The court emphasized that Valisure tested "108 unique batches of products," but "only 59 had detectable levels of benzene, and that 'many of the body spray products Valisure tested did not contain detectable levels of benzene.'" *Id.* Thus, even taking the plaintiffs' allegations as true, "[t]hat two batches of the kind of antiperspirant product Rooney used allegedly contained benzene [did] not render plausible plaintiffs' assertion that Rooney herself was exposed to benzene." *Id.* That case, therefore, stands for the proposition that a plaintiff must match the product allegedly causing her injury to granular evidence showing that the specific batch, or lot number, used by the plaintiff was affected by the defect.

Similarly, in *Foreman v. Procter & Gamble Co.*, the court dismissed claims that the plaintiffs' multiple myeloma was caused by benzene exposure from P&G's Secret Powder Fresh 24 HR Aerosol spray. No. 2:23-CV-00076, 2023 WL 8853725, at *1 (W.D. La. Dec. 20, 2023). As in *Rooney*, the plaintiffs in *Foreman* relied upon the Valisure Tests to infer that, because some batches of the Secret product contained benzene, then it was plausible that all batches of the Secret products contained benzene. *See id.* at *3. However, like the court in *Rooney*, the court in *Foreman* focused on the "significant variability in the level of benzene from batch to batch tested" by Valisure and concluded that the plaintiffs' claims were insufficient without the "missing element" concerning "the batch or lot number of any can of spray actually used by [the plaintiffs]." *Id.* at *4. This case and *Rooney* suggest that courts should analyze this issue at a sub-product level of generality.

Plaintiff's attempt to distinguish *Rooney* and *Foreman* leaves much to be desired. True, both cases are nonbinding as out-of-circuit district court cases, but Plaintiff herself only cites to district court cases which are equally nonbinding on the Court. *See Camreta v. Greene*, 563 U.S. 692, n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even

1    upon the same judge in a different case." (quoting 18 J. MOORE ET AL., MOORE'S FEDERAL

2    PRACTICE § 134.02[1][d], (3d ed. 2011))).    On a more substantive level, Plaintiff

3    distinguishes both cases because the plaintiffs there only relied solely upon third-party

4    testing, *i.e.*, the Valisure Tests, whereas here, Plaintiff relies not only on the Valisure Tests

5    but also P&G's own internal testing that resulted in the 2021 recall.    *See* Opp'n at 16,

6    18–19.  But the *Rooney* and *Foreman* courts suggested not that the plaintiffs' claims would

7    have survived dismissal if only for more testing; those courts specifically rejected the

8    product liability claims because of a failure to tie the testing to the particularized products

9    used by the plaintiffs on a granular sub-product level.  *See Rooney*, 2023 WL 1419870,

10   at *4; *Foreman*, 2023 WL 8853725, at *4.  The Complaint here, like the ones in *Rooney*

11   and *Foreman*, fails to allege that Plaintiff used personal care products from the same batch

12   or lot as those tested by Valisure or identified in the 2021 recall.  Thus, if the Court found

13   those cases persuasive, it would dismiss the claims here as well.  More than just the *Rooney*

14   and *Foreman* courts have followed that approach.  *See Schloegel v. Edgewell Personal*

15   *Care Co.*, No. 4:21-cv-00631-DGK, 2022 WL 808694, at * (W.D. Mo. Mar. 16, 2022)

16   (dismissing claim because the plaintiff "failed to allege that she actually purchased Banana

17   Boat Sunscreen products which were adulterated with benzene" when only "some samples"

18   of the product had been found to be adulterated); *Brief*, 2023 WL 2860345, at *2–3

19   (dismissing defective product claim where the plaintiffs failed to allege that the product

20   they used was from the same lot as the ones that contained benzene).

21        On the other hand, as one might expect, Plaintiff cites a long list of cases where

22   courts have accepted defective product claims at a much higher level of generality.

23   Consider *Singleton v. Chevron USA, Inc.*, where the plaintiff brought claims under the

24   LPLA alleging that his multiple myeloma was caused by "exposure to benzene and

25   benzene-containing products allegedly occur[ing] daily over the course of his 42 years of

26   work at various locations for various, unknown employers, while he labored as a painter,

27   mechanic, construction worker, and drum filler."  835 F. Supp. 2d 144, 145 (E.D. La.

28   ///

2011).  The plaintiff alleged that, over the decades, he was tasked with "painting and cleaning paint with benzene-containing products such as paints, solvents, primers, mineral spirits, and thinners."  *Id.*  Despite these generalized allegations, the court had no trouble sustaining the claims:

> Plaintiffs have sufficiently plead enough facts to give Defendant Valspar fair notice of the claims against it.  The mere fact that Mr. Singleton does not yet point to a specific Valspar product and specific dates of exposure does not make the claim implausible under *Iqbal*.  At the pleading stage, a plaintiff is not expected, nor in most cases is he able, to articulate a claim's precise factual contours that may only later be elicited through discovery.  The complaint alleges that Valspar manufactured certain plastic primers, paints and thinners.  It need not further give "brand name" or other specific information pertaining to these products.

*Id.* at 148.  Merely alleging that "certain classes of products" were defective was enough. *Id.*

In another case, *Martin v. Crown Equipment Corp.*, the court followed *Singleton* to hold that allegations of the presence of carcinogens in paint manufactured by the defendant were sufficient to survive the pleading stage.  No. 1:13-CV-174-MHS, 2013 WL 12063924, at *2 (N.D. Ga. Apr. 15, 2013).  Failing to name "the specific 'brand name' of the product or the precise dates of [the plaintiff's] exposure [did] not make their claims implausible."  *Id.*  Instead, developing factual details such as these was "properly left to be determined during the course of discovery."  *Id.*  Taken together, *Singleton* and *Martin* stand for the proposition that generalized product allegations, as opposed to the granular product allegations required by *Rooney* and *Foreman*, are enough at the pleading stage.

/ / /

Like Plaintiff, Defendants' attempt to distinguish these cases is without force. Rather than acknowledge that *Singleton* and *Martin* fall squarely opposed to their position, Defendants relegate discussion of those cases to a footnote, positing that the instant case is different because P&G has issued a limited recall that "identified specific batches with a risk for benzene and stated that other products were unaffected." Reply at 8 n.7. This piece of evidence, according to Defendants, purportedly undermines the plausibility of Plaintiff's theory by calling into question whether the specific personal care products she used contained benzene. *See id.* But there was no recall at all in *Singleton* or *Martin*, at least not one alleged by the plaintiffs. If anything, the allegations in those two cases were as bare as bare can be, yet the courts still found the claims plausible because the plaintiffs alleged simply that "certain classes of products" were affected. *Singleton*, 835 F. Supp. 2d at 148. Consequently, *Singleton* and *Martin* cannot be distinguished on that basis, for Plaintiff cannot be faulted for alleging *even more* evidence than the plaintiffs did in those cases.

Thus, the Court must take a fresh look at what level of generality is necessary to state a plausible defective product claim. Although the Court is unaware of any Ninth Circuit precedent directly on point, it finds that court's recent opinion in *Bowen v. Energizer Holdings, Inc.*—decided during the pendency of this Motion—instructive. 118 F.4th 1134 (9th Cir. 2024). There, the plaintiff brought strikingly similar allegations to the ones in this case; she alleged "that the Banana Boat sunscreen she purchased was adulterated with benzene" and that the defendants failed to indicate as much on their labels, resulting in false or misleading advertising. *Id.* at 1138. The plaintiff specified that she purchased three distinctive products—Banana Boat Ultra Sport Sunscreen SPF 100 ("Ultra Sport 100"), Banana Boat Ultra Sport Sunscreen SPF 50 ("Ultra Sport 50"), and Banana Boat Ultra Sport Sunscreen SPF 30 ("Ultra Sport 30")—from a Rite Aid pharmacy between 2017 and 2020, and that each of the products contained benzene. *Id.* at 1139. In addition to these straightforward allegations, the plaintiff supplemented her complaint with additional evidence of benzene adulteration, consisting of personal testing of a bottle she

retained possession of, independent testing by Valisure, and a voluntary product recall.  *Id.* at 1139–40.

The defendants moved to dismiss the complaint on two grounds, lack of Article III standing under Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  *Id.* at 1141.  By the time the case got to the Ninth Circuit, only a thorny procedural question remained concerning the proper standard of review when a defendant challenges jurisdiction and the jurisdictional basis is intertwined with the merits.  *Id.* at 1142–43.  Though that procedural question is not at issue in this case, the court did touch on a point relevant to the instant Motion.

While focusing most of its attention on how lower courts should analyze a factual challenge to jurisdiction, the Ninth Circuit also addressed, albeit briefly, the precise issue presently before the Court.  The defendants in *Bowen* only challenged the factual basis of the plaintiff's claims with respect to two of the sunscreen products she purchased, the Ultra Sport 50 and Ultra Sport 100.  *Id.* at 1149 n.13.  However, the defendants "did not produce evidence showing that the Ultra Sport 30 did not contain benzene," so their challenge with respect to Ultra Sport 30 was a facial one, analyzed under the Rule 12(b)(6) standard applicable here.  *See id.* (emphasis omitted) (citing *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014)).  Under the Rule 12(b)(6) standard of review, the court explained that "although [the plaintiff] did not provide evidence to support the allegation that the Ultra Sport 30 she bought, used, and discarded contained benzene, she was not required to do so to withstand Defendants' motion to dismiss."  *Id.*  The court went on to conclude that, under the Rule 12(b)(6) standard, "in light of [the plaintiff's] allegations about the other Banana Boat spray products she purchased that contained benzene and allegations regarding [Defendant's] recall of another SPF 30 Banana Boat product . . ., [the plaintiff] has plausibly alleged that the Ultrasport 30 bottle that she purchased and used contained benzene."  *Id.*

Although the foregoing discussion was not central to the primary issue in *Bowen*, it does provide guidance to the Court.  Importantly, the court concluded that the presence of

benzene in the specific bottle of Ultra Sport 30 purchased and used by the plaintiff was plausible based on mere circumstantial allegations related to "*other* Banana Boat spray products" and a "recall of *another* SPF 30 Banana Boat product." *Id.* (emphasis added). The plaintiff's usual practice was to use the Banana Boat products and then discard the bottles when empty; thus, she did not allege any facts—with the exception of one Ultra Sport 50 bottle—directly demonstrating the presence of benzene in the specific bottles she purchased. *Id.* at 1139. Yet the court was unfazed by this omission, or even the lack of any mention of the batch number from which the plaintiff's bottles came.[3]  *See id.* at 1149 n.13.

For this reason, the Court finds the rule espoused in Defendants' out-of-circuit cases in conflict with how the Ninth Circuit is likely to view this case. Those cases, which require factual allegations on the sub-product level, impose too demanding a standard on plaintiffs. *See, e.g.*, *Rooney*, 2023 WL 1419870, at *4; *Foreman*, 2023 WL 8853725, at *4. Indeed,

---

[3] The Court notes that there is an important distinction between a false advertising case like *Bowen* and a defective product case as the Court is faced with here. That said, the distinction does not impact the Court's analysis.

In a false advertising case, a plaintiff can establish an "overpayment" injury merely by alleging "that she was exposed to false information about the product purchased, which caused the product to be sold at a higher price, and that she 'would not have purchased the goods in question absent this misrepresentation.'" *Bowen*, 118 F.4th at 1145 (quoting *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 966 (9th Cir. 2018)). Such an injury can arise even where the false information complained of did not necessarily manifest itself in the specific product purchased by the plaintiff. *See Dana v. Hershey Co.*, 180 F. Supp. 3d 652, 662–63 (N.D. Cal. 2016) (finding it "plausible that a consumer would place less value on a product produced from a supply chain involving severe labor abuses," even if the consumer does not allege that the particular product that she purchased was infected by the labor abuses).

Conversely, in a defective product case, the plaintiff must do more by alleging that the particular product complained of was defective such that the defect was the direct and proximate cause of her injury. *See Sclafani v. Air & Liquid Sys. Corp.*, 14 F. Supp. 3d 1351, 1355 (C.D. Cal. 2014) ("The plaintiff 'must prove that the defective products supplied by the defendant were a substantial factor in bringing about his or her injury.'" (quoting *Rutherford v. Owens-Illinois, Inc.*, 941 P.2d 1203, 1214 (Cal. 1997))).  Although *Bowen* concerned a false advertising claim, the language in that case may be applied to the stricter standard for defective product claims because the court determined that the plaintiff had "plausibly alleged that *the Ultrasport 30 bottle that she purchased and used* contained benzene." *Bowen*, 118 F.4th at 1149 n.13 (emphasis added).

one of the cases cited by Defendants relies on the Eighth Circuit precedent of *Wallace v. ConAgra Foods, Inc.*, which holds that in "the context of defective products, 'it is not enough for a plaintiff to allege that a product line contains a defect or that a product is at risk for manifesting this defect; rather, the plaintiffs must allege that *their* product *actually exhibited* the alleged defect.'"  *Schloegel*, 2022 WL 808694, at *2 (quoting *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014)).  Although other circuits have seemingly adopted the same standard, the Ninth Circuit has not followed suit.  *See In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 530–32 (7th Cir. 2024) (following *Wallace* and indicating that the Eleventh, Third, and Fifth Circuits have done the same).  At least one court within this circuit has already expressed doubt that the rule from *Wallace* is workable, and *Bowen* provides an additional datum from which to deduce that the Ninth Circuit would decline to follow its sister circuits with respect to this issue. *See Dana*, 180 F. Supp. 3d at 662 n.8 (rejecting *Wallace* by noting that "it would be a bizarre result if sellers advertising food as halal or kosher, diamonds as conflict-free, or products as union-made could knowingly mix compliant and non-compliant products with impunity so long as there was no way for a buyer to trace the specific item he or she purchased back to the source").

Though the Court does not find *Wallace* or Defendants' cases persuasive, neither does it find persuasive the decisions cited by Plaintiff that rendered plausible defective product claims where the allegations failed entirely to specify a particular product.  Those cases were decided upon the outdated premise that the rationale behind the pleading standard was merely to "plead enough facts to give [the defendant] fair notice of the claims against it."  *See Singleton*, 835 F. Supp. 2d at 148; *Martin*, 2013 WL 12063924, at *2 (adopting the reasoning of *Singleton*).  But that rationale was reconceived in *Twombly*, where the Supreme Court focused on the *plausibility* of the allegations, explaining that "[w]ithout some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing *not only* 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." *Twombly*, 550 U.S. at 555 n.3 (emphasis added)

1  (citing 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1202, at 94, 95
2  (3d ed. 2004)).

3         With the post-*Twombly* emphasis on the plausibility of the claims, a plaintiff in a
4  defective product suit must allege more than a "class[] of products" or even a product line,
5  as some courts have allowed in the past. *See Singleton*, 835 F. Supp. 2d at 148. Instead, a
6  plaintiff must at least allege what the defective product is. To accept less than this is to
7  preclude the Court from making a good faith determination as to whether the plaintiff's
8  claims are plausible, as is required by *Twombly* and *Iqbal*. There may be certain
9  idiosyncratic situations, such as in the case of an alleged defective medical device, where
10  requiring a plaintiff to plead a specific product imposes an "onerous pleading burden," but
11  this is not one of those situations. *See Coleman v. Boston Sci. Corp.*, 2011 WL 1532477,
12  at *2. Unlike there, where an "injustice [may] result from requiring specific identification
13  of a precise product during the pleading phase" due to the "manufacturers [being] in a
14  better position to ascertain which of their devices was likely used in a given procedure," in
15  this case, Plaintiff is much better situated to allege which of the Herbal Essences shampoo
16  and conditioner products she used. *See id.* at *5. This outcome is consistent with *Bowen*,
17  where the court determined that factual allegations of benzene exposure were plausible
18  where the plaintiff identified three specific affected products. *Bowen*, 118 F.4th at 1139.

19         Accordingly, because Plaintiff has failed to allege which Herbal Essences products
20  she actually purchased and used, she has failed to state a claim as to all six causes of action.[4]
21  All claims are, thus, **DISMISSED WITHOUT PREJUDICE**. Despite Defendants'
22  request for the Court to deny Plaintiff's request for leave to amend, Reply at 11 (citing
23  Opp'n at 28–29), Plaintiff's claims can clearly be cured by amendment, so Plaintiff will be
24  given leave to amend. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) ("Rule 15(a) declares
25  that leave to amend 'shall be freely given when justice so requires.'").

26  ────────────────

27  [4] It is worth repeating that Plaintiff need not allege the batch or lot numbers from which the products she
28  purchased are from. It is enough for Plaintiff to identify the product(s) by name. Only then can the Court
    make the determination as to whether it is plausible that she was exposed to benzene.

### B.     Fraudulent Concealment

Though the Court need not address the remainder of the Parties' arguments, it will briefly do so with respect to Plaintiff's fraudulent concealment claim in the interests of judicial economy.  The thrust of Plaintiff's claim is that the Defendants were aware of the presence of benzene in the Products but intentionally maintained the Products on the market while actively deceiving the public.  Compl. ¶ 101–10.

In California, plaintiffs alleging fraudulent concealment must plead five elements:

> (1) [T]he defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.

*Kaldenbach v. Mut. of Omaha Life Ins. Co.*, 100 Cal. Rptr. 3d 637, 652 (Ct. App. 2009) (quoting *Roddenberry v. Roddenberry*, 51 Cal. Rptr. 2d 907, 926 (Ct. App. 1996)).

Because this is a fraud claim, Federal Rule of Civil Procedure 9(b) sets the bar for Plaintiff's pleadings.  *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102–03 (9th Cir. 2003).  Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  These allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong."  *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (quoting *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993)) (internal quotation marks omitted).  "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged.  [A] plaintiff must set forth *more* than

the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." *Vess*, 317 F.3d at 1106 (citations omitted).

Plaintiff's allegations in support of her fraudulent concealment claim do not meet Rule 9(b)'s heightened pleading standard. Although the Complaint alleges that "P&G knowingly falsified their test results, ignored and suppressed data, abdicated their responsibility to test, and/or further falsely mischaracterized adverse test data," it does not allege *who* falsified the test results, *when* and *where* the test results were falsified, or *how* they were falsified. *See id.* Moreover, Plaintiff asserts this claim against all Defendants, yet she alleges no facts whatsoever to suggest that either Walmart or Target had any involvement in the alleged concealment. Accordingly, this claim falls far short of the demands of Rule 9(b).

## CONCLUSION

In light of the foregoing, the Court **GRANTS** Defendants' Motion to Dismiss (ECF No. 14). All claims are **DISMISSED WITHOUT PREJUDICE**. As the Court cannot definitively conclude doing so would be futile, the Court will provide Plaintiff the opportunity to amend. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000). Within twenty-one (21) days of this Order, Plaintiff either **(1) SHALL FILE** an amended complaint, or **(2) SHALL INDICATE** to the Court that it will not do so. ***Failure to timely select either of the above options may result in the dismissal of this action pursuant to Federal Rule of Civil Procedure 41(b)***. *See Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 890–91 (9th Cir. 2019) (explaining that courts may dismiss an action under Rule 41(b) when a plaintiff fails to comply with a court order requiring the filing of an amended complaint). Any amended complaint must be complete in and of itself without reference to Plaintiff's original Complaint; claims not realleged in the amended complaint will be considered waived. *See* S.D. Cal. CivLR 15.1; *Lacey v. Maricopa County*,

/ / /

/ / /

693 F.3d 896, 928 (9th Cir. 2012) (noting claims dismissed with leave to amend that are not realleged in an amended pleading may be "considered waived").

**IT IS SO ORDERED.**

Dated:  February 6, 2025

Hon. Janis L. Sammartino
United States District Judge

24-CV-856 JLS (SBC)